No. 17-2115

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

JENNA ZINGG,
*Plaintiff-Appellant,*

v.

THOMAS GROBLEWSKI and MASSACHUSETTS PARTNERSHIP FOR
CORRECTIONAL HEALTHCARE,
*Defendants-Appellees.*

_____

Appeal from a Final Judgment of the
United States District Court for the District of Massachusetts

_____

**BRIEF OF PLAINTIFF-APPELLANT JENNA ZINGG**

_____

David Milton, 1st Circuit No. 125026
Howard Friedman, 1st Circuit No. 70615
Georgi Vogel Rosen, 1st Circuit No. 1182152
Law Offices of Howard Friedman, P.C.
90 Canal Street, 5th Floor
Boston, MA 02114-2022
(617) 742-4100

Dated: February 15, 2018

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

JURISDICTIONAL STATEMENT ...................................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...................... 2

STATEMENT OF THE CASE ............................................................................ 3

    A.    Statement of Facts ................................................................. 3

        1.    Ms. Zingg's history of severe psoriasis ..................................... 3

        2.    Ms. Zingg's medical treatment at MCI-Framingham ............. 5

        3.    Opinion of Ms. Zingg's medical expert .................................... 11

        4.    Dr. Groblewski's responsibility to control medication costs..13

    B.    Procedural History ................................................................. 14

SUMMARY OF THE ARGUMENT ...................................................................... 15

STANDARD OF REVIEW .................................................................................. 16

ARGUMENT ........................................................................................................ 17

    I.    Because the record viewed in Ms. Zingg's favor establishes that Dr. Groblewski acted with deliberate indifference to her medical needs, summary judgment was improper ............................................ 17

        A.    Deliberate indifference standard ................................................. 17

        B.    A jury could find deliberate indifference because the evidence shows that Dr. Groblewski made a medically indefensible decision in a medically unacceptable manner.... 18

            1.    Dr. Groblewski consciously disregarded Ms. Zingg's medical needs by prescribing medication certain to fail ...................................................................... 18

2.    Dr. Groblewski failed to exercise proper medical judgment by denying recommended treatment without gathering more information ............................ 21

3.    A reasonable jury could find that Dr. Groblewski denied Humira because of its cost ................................. 24

4.    Ms. Zingg's receipt of proper treatment after several weeks of unnecessary suffering does not absolve Dr. Groblewski of liability ....................................................... 25

C.    The district court erred by failing to view the record on summary judgment in the light most favorable to Ms. Zingg ................................................................................... 27

1.    The district court did not credit the opinion of Ms. Zingg's well-qualified expert ............................................ 27

2.    The district court improperly resolved additional factual disputes and drew inferences in Defendants' favor ..................................................................................... 30

II.    Dr. Groblewski is not entitled to qualified immunity ........................ 31

CONCLUSION ......................................................................................... 33

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(C) .......................... 34

CERTIFICATE OF SERVICE ..................................................................... 35

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ............................................................ 31

*Battista v. Clarke*, 645 F.3d 449 (1st Cir. 2011) ........................................................... 18

*Cady v. Walsh*, 753 F.3d 348 (1st Cir. 2014) ............................................................... 31

*Consolo v. George*, 58 F.3d 791 (1st Cir. 1995). .......................................................... 17

*Darrah v. Krisher*, 865 F.3d 361 (6th Cir. 2017) ..................................... 20-21, 23-26

*DesRosiers v. Moran*, 949 F.2d 15 (1st Cir. 1991) ....................................................... 18

*Estate of Clark v. Walker,* 865 F.3d 544 (7th Cir. 2017) ........................................... 32

*Estelle v. Gamble*, 429 U.S. 97 (1976) ......................................................................... 26

*Farmer v. Brennan*, 511 U.S. 825 (1994) ............................................................. 18, 24

*Frazier v. Bailey*, 957 F.2d 920 (1st Cir. 1992) ........................................................... 32

*Hinson v. Edmond*, 192 F.3d 1342 (11th Cir. 1999) ................................................... 32

*Jensen v. Lane Cty.*, 222 F.3d 570 (9th Cir. 2000) ...................................................... 32

*Johnson v. Wright,* 412 F.3d 398 (2d Cir. 2005) ......................................................... 23

*Jones v. City of Boston*, 845 F.3d 28 (1st Cir. 2016) ................................................... 27

*Kelley v. LaForce*, 288 F.3d 1 (1st Cir. 2002) ............................................................. 32

*Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014) (en banc) ......................................... 17

*Leavitt v. Corr. Med. Servs.*, 645 F.3d 484 (1st Cir. 2011) ....................... 2, 17-19, 24

*McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999) ................................................... 19

*McCullum v. Tepe*, 693 F.3d 696 (6th Cir. 2012) ........................................................ 32

*Old Republic Ins. Co. v. Stratford Ins. Co.*, 777 F.3d 74 (1st Cir. 2015)....................16

*Perry v. Roy*, 782 F.3d 73 (1st Cir. 2015)................................................17-18, 25-26

*Petties v. Carter*, 836 F.3d 722 (7th Cir. 2016) (en banc) .................................. 19, 29

*Richardson v. McKnight*, 521 U.S. 399 (1997).........................................................31-32

*Richmond v. Huq*, 879 F.3d 178 (6th Cir. 2018).........................................................25

*Sealock v. Colorado*, 218 F.3d 1205 (10th Cir. 2001) (en banc) ....................... 23, 27

*Swain v. Spinney*, 117 F.3d 1 (1st Cir. 1997) .............................................................32

*Xiaoyan Tang v. Citizens Bank, N.A.*, 821 F.3d 206 (1st Cir. 2016) ......................16

## Statutes

28 U.S.C. § 1291 ...............................................................................................1

28 U.S.C. § 1331 ...............................................................................................1

28 U.S.C. § 1343(a)(3) .....................................................................................1

42 U.S.C. § 1983 ...............................................................................................1

## Other Authorities

U.S. Const. amend. XIV ............................................................................. 1, 14, 17

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3). Plaintiff-Appellant, Jenna Zingg, brought this case under 42 U.S.C. § 1983 for violation of the Fourteenth Amendment to the United States Constitution, and under Massachusetts law for negligence.

The Court of Appeals has jurisdiction under 28 U.S.C. § 1291. Ms. Zingg appeals from the final judgment of the district court. The judgment, entered November 7, 2017, disposed of Ms. Zingg's § 1983 claim, and dismissed her state-law claim without prejudice. Ms. Zingg filed a timely notice of appeal on November 13, 2017.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Ms. Zingg alleges that Dr. Thomas Groblewski, D.O., and the Massachusetts Partnership for Correctional Healthcare ("MPCH") were deliberately indifferent to her serious medical needs when she was a pretrial detainee.

This appeal presents the following question:

Did the district court err by granting Defendants' motion for partial summary judgment when the record contained disputed facts about whether the medical treatment Dr. Groblewski provided to Ms. Zingg was "so clearly inadequate as to amount to a refusal to provide essential care"? *Leavitt v. Corr. Med. Servs.*, 645 F.3d 484, 503 (1st Cir. 2011) (citation and quotation marks omitted).

## STATEMENT OF THE CASE

**A.      Statement of Facts**

**1.      Ms. Zingg's history of severe psoriasis**

Plaintiff, Jenna Zingg, was a pretrial detainee at Massachusetts Correctional Institution-Framingham ("MCI-Framingham") from March 12, 2013, to September 5, 2013. Joint Appendix ("JA") 834. When she entered MCI-Framingham, Ms. Zingg was 27 years old and had a long history of severe psoriasis. *Id.*

Psoriasis is a common, chronic inflammatory skin condition. JA 428. Severe psoriasis has a tremendous impact on a patient's physical and emotional health and quality of life. *Id.* Psoriasis causes red, raised scaly plaques on the skin that can be painful and itchy. *Id.* at 109, 428. When psoriasis occurs in a person's body folds or on her genitals, the effects on quality of life are particularly harmful. *Id.* at 428. People with psoriasis have higher rates of depression and anxiety than those without psoriasis. *Id.* at 428, 445-47.

Ms. Zingg's psoriasis had at times covered more than 30% of her body's surface area. JA 426. Greater than 10% is considered severe disease according to accepted national guidelines. *Id.*

Before entering MCI-Framingham, Ms. Zingg had tried a variety of psoriasis treatments. JA 426, 607. She had tried topical treatments including steroids such as clobetasol, and vitamin D analogs such as Dovonex. *Id.* at 426, 836. Clobetasol is the most potent topical medication. *Id.* at 496. It is much more potent than Dovonex,

which is for very mild disease. *Id.* at 429, 495-96. Topical treatments had failed to control Ms. Zingg's psoriasis. *Id.* at 426, 607, 623. She had also tried systemic medications, which are internal medications that target the immune system. *Id.* at 425-26, 607; Supplemental Joint Appendix ("SJA") 344. Ms. Zingg had responded well to Humira, a systemic treatment known as an anti-TNF agent. JA 426, 607. When Ms. Zingg took Humira, her psoriasis was well-controlled; her skin was all or mostly clear of psoriasis plaques. *Id.*

Humira works by suppressing the immune system. JA 553. While this creates a slightly increased risk of infection, with proper screening, monitoring and vaccination, anti-TNF agents have been used widely, routinely, and safely for over a decade. *Id.* at 429. They have proven highly effective for psoriasis and psoriatic arthritis. *Id.*

Approximately 30% of individuals with psoriasis have psoriatic arthritis. JA 426, 429. Left untreated, psoriatic arthritis can cause permanent joint damage. *Id.* at 426, 429. Before entering MCI-Framingham, Ms. Zingg had a history of joint pain and swelling. *Id.* at 426, 607. These were controlled when she was on Humira. *Id.* When she was off Humira, her joint pain would return. *Id.* This history indicates probable psoriatic arthritis. *Id.* at 426, 525-31. At least one doctor had formally given her this diagnosis. *Id.* at 426. Topical treatments do not treat psoriatic arthritis. *Id.* at 429.

On February 6, 2013, Ms. Zingg saw her treating dermatologist, Dr. Thomas Cooper, for the last time before entering MCI-Framingham on March 12, 2013. SJA

268. Ms. Zingg had been taking Humira continually for approximately 9 months. *Id.* at 275. Dr. Cooper noted that she was "doing well on Humira." *Id.* at 268. She did not have any pain, itching, or bleeding on her skin. *Id.* She had "modest" psoriasis signs on her elbows and inner thighs. *Id.* The fact that her skin was not 100% clear was normal and did not indicate that the Humira was not effective. JA 600. Ms. Zingg did not have joint pain. *Id.* at 608; SJA 268.

### 2.    Ms. Zingg's medical treatment at MCI-Framingham

At Ms. Zingg's initial medical assessment at MCI-Framingham on March 21, 2013, a nurse practitioner noted Ms. Zingg's history of psoriatic arthritis and lack of success with topical treatments. SJA 107. The nurse practitioner noted Ms. Zingg's condition was "well-controlled on Humira." *Id.* at 109. A physical exam showed "no current psoriatic plaques." *Id.* at 107. Ms. Zingg informed the nurse practitioner that she was due for her next Humira shot on March 26. *Id.*

On April 10, Ms. Zingg submitted a sick call request form ("sick slip") stating that she was two weeks overdue for her Humira shot, and that psoriasis was "already coming back on certain parts of my body." SJA 5. On April 18, Ms. Zingg submitted another sick slip stating, "[I] still haven't heard anything about my psoriasis (OR) my arthritis. I (NEED) my medication." *Id.* at 6.

On April 25, Patricia Casella, a physician's assistant ("PA"), saw Ms. Zingg. SJA 7. PA Casella noted that she had obtained records from Ms. Zingg's dermatologist. *Id.* The records showed that Ms. Zingg had repeatedly been approved

for Humira and had responded well to it. JA 426. The records confirmed that topical medications, including clobetasol and Dovonex, had proven ineffective. *Id.* at 426, 758-59.

On April 10, 2013, Ms. Zingg's lawyer sent a letter to the MCI-Framingham medical department requesting proper treatment for Ms. Zingg and enclosing a letter from Dr. Cooper. JA 624-25. Dr. Cooper wrote that Ms. Zingg had severe psoriasis and psoriatic arthritis. *Id.* at 624. He stated, "Surface medications have been inadequate to treat her skin condition. Surface medications cannot possibly treat her psoriatic arthritis." *Id.* Dr. Cooper also wrote, "Jenna [Zingg] has responded well to Humira injections in the past and I am confident she will respond now." *Id.* PA Casella put a copy of Dr. Cooper's letter in Ms. Zingg's medical file on or about June 6, 2013. *Id.* at 624, 852-53. Dr. Groblewski was copied on a DOC official's July 12 letter responding to Ms. Zingg's lawyer. *Id.* at 827.

PA Casella examined Ms. Zingg at the April 25 visit. SJA 7. Ms. Zingg reported elbow pain since being off Humira. *Id.* PA Casella noted small spots of psoriasis on both elbows. *Id.* PA Casella wrote that her plan was to prescribe clobetasol, as well as a prescription shampoo as needed. *Id.* PA Casella told Ms. Zingg that Humira would not be approved because it cost $1,000 per shot. JA 608, 778-79.

On June 16, Ms. Zingg submitted a sick slip. SJA 11. She requested a visit for a different medical issue but added, "Not to mention nothing is being done about my psoriasis which is getting worse by the day." *Id.*

Clobetasol did not control Ms. Zingg's psoriasis, which became increasingly severe. SJA at 50. From July 1 to July 11, Ms. Zingg submitted four sick slips seeking treatment for her psoriasis and one sick slip requesting a mental health appointment. *Id.* at 13-17. These sick slips, excerpted below, describe her symptoms:

| | |
|---|---|
| **July 1:** | "My psoriasis is getting worse to the point where it hurts to walk and when I wash in the shower. Arthritis is also bothering me." "Creams DO NOT WORK." *Id.* at 13. |
| **July 5**: | "It is all over me . . . It's to the point where it hurts to sit or shower!!" *Id.* at 14. |
| **July 8:** | [*Requesting a mental health appointment:*] "The jail refuses to give me the medication I need to treat [my psoriasis].";  "I am now having trouble sleeping and when I do, I wake up depressed in the middle of the night." *Id.* at 15. |
| **July 10:** | "Between my legs is red raw and it hurts to walk or shower, or wear pants."; "I need to be given different pants until something is done."; "I now have psoriasis on my feet which I never had before." *Id.* at 16. |
| **July 11:** | "My psoriasis is getting worse. I now have it on my arms & armpits, thighs, hands, in ears, feet, vaginal area, buttocks and other places. I am in pain and my sick slips are being ignored."; "It hurts to walk and shower." *Id.* at 17. |

Ms. Zingg saw PA Casella on July 12. PA Casella noted that Ms. Zingg had psoriasis on her elbows, hands, and feet, as well as the following areas: "[l]egs[,] inner thighs[,] vulva & perirectal area with large plaques noted covering 90% of her vulva and inner thighs." Ms. Zingg also reported joint pain at her elbows and ankles. *Id.* at 18.

After the July 12 visit, PA Casella prescribed Humira. *Id.* at 18, 50-51. She also

prescribed Dovonex "pending" approval of Humira. *Id.* at 51. Because neither

medication was on the MPCH drug formulary, PA Casella completed non-formulary

request forms seeking authorization for the prescriptions. *Id.* at 50-51. The request for

Humira stated that Ms. Zingg had a history of moderate to severe psoriasis and that

outside records confirmed she had been on Humira in the community. *Id.* at 50. The

request stated that Ms. Zingg had been taking clobetasol .05% cream for several

months since being incarcerated, yet her psoriasis and joint pain were increasing. *Id.*

The request stated that Ms. Zingg had moderate plaque lesions on her elbows and

"severe psoriasis" covering 90% of her "[p]roximal inner thighs & vulva & and

perirectal area." *Id.* The request concluded, "[Patient] needs to resume her [H]umira

40 mg every other week as in community." *Id.* The request for Dovonex contained

the same information, except that PA Casella wrote that Dovonex was "indicated

pending Humira approval." SJA at 51.

Dr. Groblewski, the statewide medical director for MPCH, reviewed all non-

formulary requests for DOC prisoners (with limited exceptions inapplicable here).

JA 689. No non-formulary request could be granted without his approval. *Id.* He

reviewed PA Casella's non-formulary requests for Dovonex and Humira. *Id.* 652, 728.

Dr. Groblewski trusted PA Casella's clinical judgment. *Id.* at 657-58.

On July 15, 2013, Dr. Groblewski approved Dovonex but denied Humira.

JA 728. He had no information about Ms. Zingg other than what PA Casella included

in the two non-formulary requests. *Id.* at 727-32, 852. He had never seen Ms. Zingg.

8

*Id.* at 729. He had not discussed her case with PA Casella or anyone else. *Id.* He had not reviewed any medical records. *Id.* at 727-32, 852. He did not know what medications other than clobetasol she had tried without success. *Id.* He knew only that clobetasol, the highest potency topical medication, had failed. JA at 852; *see also* JA 100 (MPCH drug protocol listing clobetasol as "Super high potency"), *id.* at 496 (describing clobetasol as the "most potent topical"). Dr. Groblewski could have obtained more information about Ms. Zingg before making a decision about medication to provide her, and had done so in other cases, but he did not do so in Ms. Zingg's case. *Id.* at 687, 732. Dr. Groblewski gave no explanation for his decision. SJA 50-51.

Ms. Zingg's condition continued to worsen with only topical treatments. SJA 20-28. Her psoriasis spread and her joint pain increased. *Id.* Between July 22 and August 2, Ms. Zingg submitted six sick slips describing her deteriorating physical condition. *Id.* at 20-22, 24-27. She submitted another sick slip requesting a mental health appointment. *Id.* at 21.

Ms. Zingg's condition began to interfere with her activities of daily living. Sitting, walking, washing herself, showering, and going to the bathroom became painful. SJA 25. Her hearing diminished because the psoriasis plaques in her ears grew so thick. JA 611-14, 780-81. The jeans that prisoners had to wear caused her pain. *Id.* at 611-12. Prison officials refused to provide softer clothing. *Id.*

9

Ms. Zingg grew anxious and depressed. *Id.* at 611-14, 787-88. Notes from mental health staff document her increasing mental distress as a result of her deteriorating physical condition and lack of proper treatment. SJA 83.

On August 1, PA Casella submitted a request for Ms. Zingg to see a dermatologist at the outpatient clinic at the Shattuck Hospital. JA 768-70; SJA 45. MPCH approved the referral on August 6. SJA 46-47. Dr. Groblewski had no involvement in the request or its approval. *Id.* at 46-47; JA 766-67.

On August 6, PA Casella recorded that Ms. Zingg was having increasing joint pain and that her psoriasis was spreading. SJA 28. PA Casella noted psoriasis on widespread parts of Ms. Zingg's body as well as secondary skin changes including skin fissuring at the gluteal cleft. *Id.*; JA 427-28. PA Casella wrote that Ms. Zingg was tearful during this visit. SJA 28.

On August 9, Ms. Zingg went to an outpatient clinic at the Shattuck Hospital. SJA 357. There, a physical examination showed the following:

> [S]almon colored flaky, often thick rash covering many extensor surfaces of her body including her elbows and the dorsum of her hands bilaterally and her fingers;
>
> [S]potted areas covering her chest and the entirety of her back;
>
> [R]ash involving her labia in the folds of her groin, and her pelvic area in addition to the area around her buttocks and her anus;
>
> [F]laking at the bottom of her heels involving the posterior aspect of her feet;

> [A]reas [of psoriasis] involving her armpits and some scaling
> around her scalp.

*Id.* at 357-58.

Psoriasis covered 30% of her body. *Id.* at 359-60. A rheumatologist diagnosed her with severe psoriasis with mild psoriatic arthritis, and wrote that she needed Humira. *Id.* at 359-60*; see also id.* at 356, discharge summary ("[A]nti-TNF agents are medically necessitated at this time.").

Ms. Zingg was admitted as an inpatient to the Shattuck Hospital to expedite Humira treatment. SJA 356. After standard laboratory screening showed no increased risk of infection from Humira, Ms. Zingg received an initial dose on August 11. *Id.* She was discharged to MCI-Framingham the next day. *Id.* Ms. Zingg received a Humira shot at MCI-Framingham on August 27. *Id.* at 353. On September 3, PA Casella noted significant improvement of Ms. Zingg's psoriasis. *Id.* at 33. Her joint pain was also decreasing. *Id.* at 33. In photos taken on September 18, after Ms. Zingg was released from MCI-Framingham, her psoriasis is much less pervasive than it was before her first dose of Humira at the Shattuck Hospital. JA 428.

### 3.    Opinion of Ms. Zingg's medical expert

Ms. Zingg submitted the expert report and testimony of Dr. Joseph Merola, M.D., M.M.Sc., a board-certified dermatologist, rheumatologist, and internist specializing in psoriasis and psoriatic arthritis. JA 424-603. His qualification as an

expert witness was undisputed. *See* Addendum ("Add.") 10; *see also* JA 285-318 (Dr. Merola's curriculum vitae).

Dr. Merola gave the following opinions: Dr. Groblewski's decision to deny Humira in favor of Dovonex lacked any medical justification and needlessly caused Ms. Zingg's already severe condition to deteriorate. JA 425-26. Dr. Groblewski's failure to approve Humira or to prescribe another systemic treatment violated well-established treatment guidelines as well as MPCH's own treatment protocols. *Id.* at 425, 429, 494-97. It was obvious that Dovonex, a very mild topical medication, would not be effective when clobetasol, the highest potency topical medication, had failed. *Id.* at 425, 429-30, 623. According to Dr. Merola, prescribing Dovonex was the functional equivalent of providing no treatment at all. *Id.* at 425, 429-30.

Dr. Merola stated that, by itself, the information in the non-formulary request submitted by PA Casella made clear that Ms. Zingg's condition was severe and getting worse and that continued use of clobetasol, much less Dovonex, would not be effective. JA 425, 516-21. The mention of joint pain in the request provided an additional reason to prescribe Humira or another systemic treatment approved for inflammatory joint disease. *Id.* at 426, 516-21. At the minimum, the possibility of psoriatic arthritis—which can cause serious, permanent harm if not treated—required further inquiry into Ms. Zingg's history and current condition. *Id.* at 425-26, 519-20.

Dr. Merola stated that Dr. Groblewski did not engage in a medically acceptable decision-making process. JA 426, 429. There was no justification for denying

12

recommended treatment for a severe disease without personally examining Ms. Zingg, reviewing any medical records, or obtaining additional information. *Id.* at 425, 430, 506-07.

Dr. Merola concluded that Dr. Groblewski's denial of adequate medical treatment caused Ms. Zingg's skin disease, joint pain, and attendant suffering to worsen. JA 426. Dr. Merola stated these harms were preventable. *Id.* at 426, 430.

### 4.    Dr. Groblewski's responsibility to control medication costs

At the time of Dr. Groblewski's medication decision on July 15, 2013, MPCH was solely responsible for providing medical services to DOC prisoners. JA 827. MPCH is a private, for-profit corporation created by two larger corporations, MHM, Inc., and Centene Corporation. *Id.* at 828-33.

Dr. Groblewski's responsibilities as the medical director of MPCH included establishing and monitoring budgets, and containing pharmaceutical costs. JA 53-54, 65, 676. Under its contract with the DOC, MPCH received a fixed payment for pharmaceutical expenditures. Thus, every amount MPCH spent on medications reduced its revenue by that amount. *Id.* at 794-96, 799-808.

Dr. Groblewski knew that cost containment was important to his employer. JA 675. He spoke regularly with MHM's national director of pharmaceuticals about medication costs. *Id.* at 683-86. He attended monthly utilization-review meetings at which a representative from MPCH's parent corporation would discuss pharmaceutical costs. *Id.* at 690-92. Psoriasis treatments were discussed, including the

13

cost and amount of Humira prescribed. *Id.* at 694. Dr. Groblewski knew that Humira was expensive and that it cost more than topical treatments. *Id.* at 696.

## B.    Procedural History

Ms. Zingg filed suit on March 11, 2015, asserting a claim under 42 U.S.C. § 1983 for violation of her Fourteenth Amendment right to adequate health care, and a claim under Massachusetts law for negligence. JA 2, 10-20. Following discovery, on December 8, 2016, Defendants moved for summary judgment on Ms. Zingg's § 1983 claim. *Id.* at 5. The district court did not hold a hearing. On September 29, 2017, the district court allowed Defendants' motion. *Id.* at 5-6. On November 7, 2017, the court entered final judgment for Defendants on Ms. Zingg's § 1983 claim and dismissed the negligence claim without prejudice to refiling in state court. Add. 1. This timely appeal follows. *JA* at 7.

## SUMMARY OF THE ARGUMENT

The district court erred by granting Defendants' motion for summary judgment because the record showed genuine disputes of material fact about whether Dr. Groblewski provided Ms. Zingg with constitutionally adequate medical care. Viewed in Ms. Zingg's favor, the record showed that Dr. Groblewski made a medically indefensible decision in a medically unacceptable manner. Ms. Zingg submitted evidence that Dr. Groblewski's decision to deny Humira and to provide only Dovonex was so clearly inadequate that it was tantamount to denying treatment altogether. Dr. Groblewski further showed deliberate indifference by denying medication recommended by Ms. Zingg's clinical provider for a serious and worsening condition without consulting with the provider, examining Ms. Zingg, or reviewing her records. The record also permits the inference that Dr. Groblewski denied Humira for financial reasons, not medical ones. Ms. Zingg's receipt of proper treatment after several weeks of unnecessary suffering does not absolve Dr. Groblewski of liability.

The district court went beyond its role at summary judgment by weighing the medical evidence and disregarding Ms. Zingg's expert doctor's opinion that Dovonex was certain to fail. The district court also improperly drew inferences in Defendants' favor about Dr. Groblewski's intent. A jury could disagree with the court's conclusion that Dr. Groblewski's medication decision reflected his "professional medical judgment." Add. 18-19.

15

The district court did not address Dr. Groblewski's assertion of qualified immunity because it found he did not commit a constitutional violation. As a private prison doctor, Dr. Groblewski is categorically barred from raising the qualified immunity defense. In any event, factual disputes would preclude qualified immunity even if Dr. Groblewski could assert it.

## STANDARD OF REVIEW

"The grant of summary judgment is subject to *de novo* review, with all reasonable inferences drawn in favor of . . . the non-moving party." *Xiaoyan Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 215 (1st Cir. 2016). Affirmance is proper "only if the record discloses no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Old Republic Ins. Co. v. Stratford Ins. Co.*, 777 F.3d 74, 79 (1st Cir. 2015) (quotation marks omitted).

**ARGUMENT**

**I.    Because the record viewed in Ms. Zingg's favor establishes that Dr. Groblewski acted with deliberate indifference to her medical needs, summary judgment was improper**

Viewed in the light most favorable to Ms. Zingg, the non-moving party, the summary judgment record supports a jury verdict in her favor. The district court erred by resolving disputed medical facts and drawing inferences about Dr. Groblewski's state of mind in Defendants' favor.

**A.    Deliberate indifference standard**

As a pretrial detainee, Ms. Zingg had a right to adequate health care under the Due Process Clause of the Fourteenth Amendment. *Perry v. Roy*, 782 F.3d 73, 78 (1st Cir. 2015); *Consolo v. George*, 58 F.3d 791, 794-95 (1st Cir. 1995). Prison doctors violate this right when they "exhibit deliberate indifference to a detainee's serious medical needs." *Perry*, 782 F.3d at 78 (citations and internal quotation marks omitted). To prove a violation, a plaintiff "must satisfy both of two prongs: (1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need." *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014) (en banc).

The subjective prong requires that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Leavitt v. Corr. Med. Servs.*, 645 F.3d 484, 497 (1st Cir. 2011) (citation and internal quotation marks omitted). "[W]here 'knowledge of

17

the need for medical care [is accompanied by the] . . . intentional refusal to provide that care,' the deliberate indifference standard has been met." *Id.* (citations omitted). "[A] deliberate intent to harm is not required." *Battista v. Clarke*, 645 F.3d 449, 453 (1st Cir. 2011) (citing *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). "Rather, it is enough for the prisoner to show a wanton disregard sufficiently evidenced 'by denial, delay, or interference with prescribed health care.'" *Id.* (citation omitted).

A doctor may not avoid liability merely by giving some treatment, no matter how poor, to a prisoner with serious medical needs. *Perry*, 782 F.3d at 81. Deliberate indifference may be found where the treatment is "so clearly inadequate as to amount to a refusal to provide essential care." *Leavitt*, 645 F.3d at 503 (citation and quotation marks omitted); *see DesRosiers v. Moran*, 949 F.2d 15, 20 (1st Cir. 1991) ("so grossly inadequate as to constitute a knowing denial of proper medical care").

Defendants admitted that Ms. Zingg had a serious medical condition. Add. 10. Only the subjective prong of the deliberate indifference standard is in dispute.

**B.    A jury could find deliberate indifference because the evidence shows that Dr. Groblewski made a medically indefensible decision in a medically unacceptable manner**

**1.    Dr. Groblewski consciously disregarded Ms. Zingg's medical needs by prescribing medication certain to fail**

Viewed in Ms. Zingg's favor, the record supports a finding that Dr. Groblewski consciously disregarded Ms. Zingg's need for a higher level of treatment than she had been receiving. Against PA Casella's recommendation, and despite the clear

indications in her non-formulary request that Ms. Zingg needed Humira or an equivalent alternative medication, Dr. Groblewski chose a much weaker treatment of the same kind that had already proven ineffective. Prescribing a very mild topical medication after the most potent topical medication had failed was "so clearly inadequate as to amount to a refusal to provide essential care." *Leavitt,* 645 F.3d at 503 (citations and quotation marks omitted); *see also Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016) (en banc) ("[R]epeatedly, we have rejected the notion that the provision of some care means the doctor provided medical treatment which meets the basic requirements of the Eighth Amendment."); *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) ("[W]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference.") (citation omitted).

The record supports the conclusion that Dr. Groblewski knew that Ms. Zingg needed Humira or another systemic medication. He knew that PA Casella, who had been treating Ms. Zingg all along and whose judgment he trusted, had concluded Humira was necessary. He knew from PA Casella's non-formulary request that Ms. Zingg's condition was severe and worsening. He knew she had a history of moderate to severe psoriasis for which she had been prescribed Humira in the community. He testified that psoriasis on the genitals, inner thighs, buttocks, and groin area—areas where the non-formulary request noted that Ms. Zingg had severe psoriasis covering 90% of the surface—heightened the seriousness of the condition. JA 715-17. He

19

knew that Ms. Zingg's condition was getting worse despite several months of treatment with the highest potency topical steroid. And he knew she was having joint pain, which is not treatable with topical medication at all. A jury could conclude from these facts that Dr. Groblewski knew that Dovonex would be ineffective.

Dr. Merola's opinion bolsters this conclusion. According to Dr. Merola, the information in PA Casella's non-formulary request would indicate to any doctor, regardless of specialty, that systemic treatment was necessary. JA 425, 519. A jury could credit Dr. Merola's opinion that there was no medical justification for denying Humira without prescribing an alternative, equivalent course of treatment (or at a minimum, gathering additional patient history, as discussed below). *Id.* at 430. Dr. Merola stated that prescribing Dovonex—a mild medication inappropriate for moderate and severe psoriasis, or for psoriatic arthritis—was directly at odds with national treatment guidelines. *Id.* at 428-30, 494-97. A rational jury could agree with Dr. Merola's opinion that denying Humira or another systemic medication, while approving only Dovonex, was tantamount to denying treatment altogether. In Dr. Merola's words, prescribing Dovonex after clobetasol had not worked was "the equivalent of shooting a pistol at an armored car after a missile had failed." *Id.* at 429.

The Sixth Circuit's opinion in *Darrah v. Krisher*, 865 F.3d 361 (6th Cir. 2017), is instructive. The plaintiff in *Darrah* had a severe form of psoriasis for which only one medication, out of many tried, had been successful. *Id.* at 364. A non-treating doctor denied authorization for this medication in favor of an untried one less likely to be

successful, resulting in months of increasingly severe symptoms and pain. *Id.* at 366. The court held the doctor could be found deliberately indifferent for "choosing to prescribe an arguably less efficacious treatment method." *Id.* at 374. The court's reasoning applies with greater force in this case, since Dovonex is not even arguably as efficacious as Humira and had already failed.

### 2.   Dr. Groblewski failed to exercise proper medical judgment by denying recommended treatment without gathering more information

A jury could find deliberate indifference not only from Dr. Groblewski's medically indefensible treatment decision but also from his failure to engage in a medically acceptable decision-making process. Dr. Groblewski denied medication recommended by Ms. Zingg's clinical provider for a serious and worsening condition without consulting with the provider, examining Ms. Zingg, or reviewing her records. He did not explain the denial or recommend an equivalent alternative. A jury could agree with Dr. Merola's opinion that this manner of decision-making violated medical norms. And it could reasonably infer that the decision did not reflect what the district court deemed "Dr. Groblewski's professional medical judgment," Add. 18-19, but a wanton disregard of the risk that Ms. Zingg's disease would continue unabated.

Dr. Groblewski admitted that general practice standards for psoriasis involved "first assessing the patient and obtaining prior medical records." JA 55. He knew that determining the right level of treatment depended on a clinical assessment of the severity of the condition—an assessment that included examining the patient,

measuring the size of her psoriatic lesions, evaluating her response to current therapies, and checking for secondary infections. *Id.* at 715-16. PA Casella, who had been treating Ms. Zingg for months, had done these things and concluded she needed Humira. Dr. Groblewski cannot recall ever disagreeing with her clinical judgment. *Id.* at 648. Yet in Ms. Zingg's case, Dr. Groblewski overruled PA Casella's determination without consulting her.

A rational jury could find that Dr. Groblewski's denial of Humira not only went against PA Casella's recommendation but also violated MPCH treatment protocols. JA 429. The protocols required two failed trials of topicals before consideration of systemic treatment. *Id.* at 97, 99. But Ms. Zingg *had* tried and failed at least two topical ointments, including Dovonex, before her incarceration.[1] And she had again tried and failed the most potent topical since arriving at MCI-Framingham.

Even if prescribing Dovonex had complied with MPCH internal protocols, a jury could find that Dr. Groblewksi showed deliberate indifference by prescribing a medication so clearly inadequate to Ms. Zingg's individual needs. Courts have repeatedly found deliberate indifference based on doctors' inflexible adherence to treatment protocols or formularies without consideration of whether they were

---

[1] Under MPCH protocols, methotrexate would ordinarily be the first systemic treatment to try before Humira or a similar drug. JA 97, 99. This would not have been appropriate in Ms. Zingg's case, because she had already tried and had an adverse reaction to methotrexate in the community. *Id.* at 97, 429. Regardless, PA Casella did not recommend methotrexate and Dr. Groblewski denied Humira in favor of Dovonex, not methotrexate. *Id.* at 56-57.

medically appropriate in a particular case. *See, e.g.*, *Darrah*, 865 F.3d at 372-73 (denying summary judgment to non-treating doctor who denied request for the only drug that had worked for the plaintiff in favor of a less efficacious drug on the formulary); *Johnson v. Wright*, 412 F.3d 398, 406 (2d Cir. 2005) (denying summary judgment where doctors denied treatment based on DOC practice guideline without taking "any steps whatsoever to assure themselves that applying the Guideline in plaintiff's case was, in fact, a medically justifiable course of action").

Dr. Groblewski's failure to make any inquiry into Ms. Zingg's medical history and response to various treatments, which were readily available to him, shows deliberate indifference. If he considered the information in the non-formulary request insufficient to justify Humira, Dr. Groblewski—as the doctor who controlled Ms. Zingg's access to treatment—had an obligation to gather more data before denying the request without offering any suitable alternative. *See Darrah*, 865 F.3d at 372 (concluding that non-treating doctor responsible for authorization of medication was thereby "responsible for ensuring that [plaintiff] received effective treatment"); *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2001) (stating that medical professional who performs "gatekeeper role" may be liable for preventing others from providing treatment); *see also* JA 378-79 (describing Dr. Groblewski's role as MPCH medical director to approve the non-formulary request, provide an alternative, or request more information). He had done so in other cases but did not give any reason why he did not do so here.

A jury could conclude from Dr. Groblewski's failure to inquire into Ms. Zingg's situation that he did not care about providing her with treatment appropriate to her needs. *See Leavitt*, 645 F.3d at 498 ("A prison official 'would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.") (citing *Farmer*, 511 U.S. at 843 n.8).

### 3.    A reasonable jury could find that Dr. Groblewski denied Humira because of its cost

Facts in the record permit the inference that Dr. Groblewski denied Humira for financial reasons. JA 418-19. Evidence of withholding necessary care to save costs supports a finding of deliberate indifference. *Leavitt*, 645 F.3d at 498; *see also Darrah*, 865 F.3d at 372 (collecting circuit court cases holding that delaying necessary medical treatment for "non-medical reasons" constitutes deliberate indifference). Such evidence may be circumstantial. *Leavitt*, 645 F.3d at 498.

Humira is expensive. JA 696. It costs approximately $2,500 a month, which is much greater than the cost of topical medications such as Dovonex and clobetasol. *Id.* at 429. PA Casella expressly told Ms. Zingg that Humira would not be approved because of its high cost. *Id.* at 608, 778-79.

Dr. Groblewski knew that Humira was expensive and that cost containment was important to his employer, a private for-profit corporation. JA 675, 696. His job responsibilities included establishing and monitoring budgets, and containing

pharmaceutical costs. *Id.* at 53-54, 65, 676. Dr. Groblewski spoke every month about the cost of medications with an executive at MPCH's parent corporation. *Id.* at 683-86. He attended monthly "utilization review" meetings at which another corporate representative provided information about medication costs. *Id.* at 690-92. Psoriasis treatments were discussed, including the cost and amount of Humira prescribed. *Id.* at 694.

From the above, a jury could reasonably conclude that Dr. Groblewski denied Humira for financial reasons. Coupled with the absence of any valid or bona fide medical reason to withhold Humira, evidence of financial motivation supports a finding of deliberate indifference. *See Darrah*, 865 F.3d at 372-73.

### 4.     Ms. Zingg's receipt of proper treatment after several weeks of unnecessary suffering does not absolve Dr. Groblewski of liability

Ms. Zingg's eventual receipt of proper treatment after being admitted to the hospital on August 9—after more than three weeks of intensifying suffering—does not negate Dr. Groblewski's deliberate indifference. His denial of proper treatment on July 15 is what caused her condition to grow so bad that hospitalization became necessary. This Court has rejected the notion that "the fact that [the prisoner] received some treatment, including eventually being transferred to a hospital, shows that his serious medical needs were not ignored." *Perry*, 782 F.3d at 81; *Richmond v. Huq*, 879 F.3d 178, 188 (6th Cir. 2018) ("The fact that the wound healed is not dispositive of whether the defendant was deliberately indifferent to the prisoner's serious medical need, as the

pain and mental anguish endured is itself sufficient to constitute cruel and unusual punishment.") (citation and quotation marks omitted). Ms. Zingg's history of responding well to Humira, and her rapid and significant improvement after receiving Humira at the Shattuck Hospital, show that the harm she suffered was "easily preventable." *Perry*, 782 F.3d at 81.

The district court's finding that "[t]he undisputed facts show a conservative, but ultimately successful, course of treatment" thus misconstrues Ms. Zingg's claim. Add. 15. Dr. Groblewski did not prescribe a "course" of treatment; he made a single decision on July 15 to override PA Casella's recommended treatment. He had no involvement in PA Casella's August 1 request for a referral to the Shattuck Hospital or in the August 6 approval of the referral. SJA 46-47. Nor was the treatment Dr. Groblewski provided "ultimately successful": it caused 24 days of increasingly severe symptoms and pain, requiring her hospitalization. The fact that this unnecessary suffering lasted "*only* for less than a month," as the district court stated, Add. 15 (emphasis added), goes to damages, not liability. Deliberate indifference is established where, as here, a knowing denial or delay in treatment results in the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted); *see also, e.g., Darrah*, 865 F.3d at 374 ("[N]eglecting a prisoner's medical need and interrupting a prescribed plan of treatment, even for a relatively short period, can constitute a constitutional violation."); *Sealock*, 218 F.3d at 1210 (holding that

defendant may be liable for delay in treatment that caused several hours of pain and suffering).[2]

**C.  The district court erred by failing to view the record on summary judgment in the light most favorable to Ms. Zingg**

**1.  The district court did not credit the opinion of Ms. Zingg's well-qualified expert**

On Defendants' motion for summary judgment, "the district court was required to assume that any disputes of material fact—*including conflicting opinions offered by competent experts*—could be resolved by the jury in [the plaintiff's] favor." *Jones v. City of Boston*, 845 F.3d 28, 32 (1st Cir. 2016) (emphasis added). The district court did not follow this requirement. The court impermissibly discounted the testimony of Ms. Zingg's expert, Dr. Merola, whose qualifications were undisputed.[3]

------

[2] The obvious inadequacy of Dr. Groblewski's chosen medication, his denial of the treatment recommended by Ms. Zingg's treating provider without giving an equivalent alternative, and his lack of any "evidence show[ing] a thoughtful concern . . . for [Ms. Zingg's] . . . well-being," *Torraco v. Maloney*, 923 F.2d 231, 235 (1st Cir. 1991), distinguish this case from those relied on by the district court. Add. 14-15; *see Ruiz-Rosa v. Rullan,* 485 F.3d 150, 156 (1st Cir. 2007) (no deliberate indifference where treating doctor prescribed one antibiotic instead of another without reason to believe the one he chose would fail); *Feeney v. Corr. Med. Servs.*, 464 F.3d 158, 162-63 (1st Cir. 2006) (no deliberate indifference where defendants were "responsive to [plaintiff's] complaints, expended substantial resources trying to get to the root of his problem, and adopted other measures in an effort to alleviate his discomfort"); *Torraco*, 923 F.2d at 236 (no deliberate indifference to mental health needs where prisoner did not present obvious suicide risk and defendants had accommodated his requests for counseling).

[3] Dr. Merola, M.D., M.M.Sc., is the Director of the Center for Skin and Related Musculoskeletal Diseases at the Brigham and Women's Hospital, and an assistant

As described above, Dr. Merola opined that Dr. Groblewski's decision to provide Dovonex instead of Humira or another systemic medication violated national guidelines for psoriasis and psoriatic arthritis, lacked any medical justification, and was the functional equivalent of providing no treatment at all. Accepting this opinion, a reasonable jury could find that giving Dovonex amounted to a denial of necessary medical care—rather than simply, as the district court described it, a "choice of a certain course of treatment" over another, Add. 13 (citation omitted), or a justifiable decision to try a "less-drastic remedy," *id.* By finding Dr. Groblewski's treatment to be "adequate, although arguably not ideal," *id.*, the court improperly substituted its view of the medical evidence for Dr. Merola's.

The court also failed to accept Dr. Merola's opinion that, without systemic treatment, it was obvious that Ms. Zingg's severe condition would get worse. Instead, the district court concluded that "the 'impending harm' . . . facing Plaintiff in the wake of Dr. Groblewski's treatment decision was far from the foregone conclusion that Plaintiff makes it out to be." Add. 13. The court based this finding on (1) the court's inference that Dr. Groblewski intended Dovonex to supplement rather than to replace clobetasol, and (2) Ms. Zingg's alleged failure to show that "Dr. Groblewski's

---

professor at Harvard Medical School. He is on the medical board of the National Psoriasis Foundation, the steering committee of the Group for Research in Psoriasis and Psoriatic Arthritis, and the board of the International Dermatology Outcome Measures group. He has over 20 peer-reviewed publications on psoriasis and psoriatic arthritis. JA 285-318.

chosen treatment, a combination of Dovonex and clobetasol, would be weaker or less effective than a straight clobetasol treatment." *Id.* at 13.

The court's view of the facts is incorrect and beside the point. Dr. Groblewski claimed he wanted to "evaluate the effectiveness of Dovonex," not Dovonex and clobetasol. JA 56. Even if he had intended to use them together, it is irrelevant whether this treatment would have been no *less* effective than the treatment Ms. Zingg had been receiving. What matters is that his decision to continue providing only topical treatment—after such treatment had failed—was not going to be effective at all. *See Petties*, 836 F.3d at 729-30 (stating that deliberate indifference may be established "where a prison official persists in a course of treatment known to be ineffective"). Crediting Ms. Zingg's version of the medical facts, a jury could find that it was indeed a "foregone conclusion" that, without systemic medication, her condition would progress and her suffering would continue.

Finally, the court improperly made the factual finding that the risk of infection from Humira warranted Dr. Groblewski's decision to deny it. Add. 13. The court's determination contradicts that of Dr. Merola, who stated that a "slightly increased" possibility of infection from Humira was not a valid reason to deny Ms. Zingg necessary treatment. JA 429. PA Casella, who recommended Humira, implicitly agreed with Dr. Merola's assessment. Dr. Groblewski himself testified that he was unaware of any DOC prisoner who had developed an infection as a result of taking Humira or similar medication. *Id.* at 724-25. Viewing the evidence in Ms. Zingg's favor, a jury

could find that this possible side effect was neither a legitimate reason nor Dr. Groblewski's actual reason for denying Humira.

### 2. The district court improperly resolved additional factual disputes and drew inferences in Defendants' favor

The district court construed other genuinely disputed facts in favor of Defendants. The court found that Dr. Groblewski's decision to provide Dovonex was consistent both with PA Casella's recommendation and with the MPCH protocols. Add. 12-13. A reasonable jury could find it was neither. A jury could thus disagree with the court's conclusion—based on its view that Dr. Groblewski chose treatment in conformity with PA Casella's recommendation and the protocols—that Dr. Groblewski did not wantonly disregard the risk of serious harm posed by his choice. *Id.*

The record viewed in Ms. Zingg's favor shows that PA Casella did not recommend Dovonex as an alternative to Humira, and that Dr. Groblewski understood this. PA Casella's non-formulary Humira request stated that Ms. Zingg "*needs* to resume her Humira 40 mg every other week as in community," SJA 50 (emphasis added), and her Dovonex request stated it was "indicated *pending* Humira approval," SJA 51 (emphasis added). Dr. Groblewski admitted that PA Casella's two requests jointly constituted "a new treatment regimen." JA 57.

A rational jury could also find that Dr. Groblewski's denial of Humira violated MPCH treatment protocols. The protocols required two failed trials of topicals before

consideration of systemic treatment. But Ms. Zingg *had* tried and failed at least two topical treatments, including Dovonex and clobetasol, before arriving at MCI-Framingham, where clobetasol failed again.

Finally, the court improperly failed to draw inferences in Ms. Zingg's favor about Dr. Groblewski's state of mind, on the grounds that "Plaintiff's argument asks the Court to make credibility determinations, which is not permitted at summary judgment." Add. 19 n.3 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)). This mischaracterizes Ms. Zingg's role as the non-moving party on summary judgment, which is to demonstrate that the record contains material factual disputes, including ones that turn on credibility. The disputes identified by Ms. Zingg, including those about "Dr. Groblewski's other potential motivations," Add. 19 n.3, are for a jury to resolve. *See Torraco,* 923 F.2d at 234 ("A state-of-mind issue such as the existence of deliberate indifference usually presents a jury question.").

## II.    Dr. Groblewski is not entitled to qualified immunity

Because the district court concluded that Ms. Zingg had not established a constitutional violation, it did not address Dr. Groblewski's assertion of qualified immunity. Regardless, qualified immunity is categorically unavailable to him as a private prison doctor. *See Richardson v. McKnight*, 521 U.S. 399, 401 (1997) (holding that private prison guards may not assert qualified immunity). Although this Court has not decided this question, *see Cady v. Walsh*, 753 F.3d 348, 350 (1st Cir. 2014), every circuit that has has held that *Richardson* compels the conclusion that private prison doctors

cannot raise qualified immunity, *Estate of Clark v. Walker,* 865 F.3d 544, 550-51 (7th Cir. 2017); *McCullum v. Tepe*, 693 F.3d 696, 703-04 (6th Cir. 2012); *Jensen v. Lane Cty.,* 222 F.3d 570, 580 (9th Cir. 2000); *Hinson v. Edmond*, 192 F.3d 1342, 1347 (11th Cir. 1999). Because *Richardson* rejected the "functional approach" to determining immunity, under which private actors could assert qualified immunity merely because they performed a public function, 521 U.S. at 408-09, it effectively overruled *Frazier v. Bailey*, 957 F.2d 920 (1st Cir. 1992), which followed this approach.

Qualified immunity would be inappropriate even if Dr. Groblewski could assert it. The same factual disputes about whether he committed a constitutional violation preclude summary judgment on the basis of qualified immunity. *See, e.g., Kelley v. LaForce*, 288 F.3d 1, 8-9 (1st Cir. 2002); *Swain v. Spinney*, 117 F.3d 1, 9-10 (1st Cir. 1997).

## CONCLUSION

For the foregoing reasons, Ms. Zingg respectfully requests that this Court reverse the district court's order granting summary judgment and remand the case for trial.

RESPECTFULLY SUBMITTED,
For the Plaintiff-Appellant,
By her attorneys,

/s/ David Milton
Howard Friedman, First Circuit No. 70615
David Milton, First Circuit No. 125026
Georgi Vogel Rosen, First Circuit No. 1182152
**Law Offices of Howard Friedman, PC**
90 Canal Street, Fifth Floor
Boston, MA 02114-2022
hfriedman@civil-rights-law.com
dmilton@civil-rights-law.com
gvogelrosen@civil-rights-law.com

## CERTIFICATE OF COMPLIANCE PURSUANT TO
## FED. R. APP. P. 32(a)(7)(C)

I, David Milton, as counsel for the Plaintiff-Appellant, Jenna Zingg, hereby certify, pursuant to Fed. R. App. P. 32(a)(7)(C), as follows:

(1) This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,618 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

(2) This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Garamond 14-point type.

Attorney for Plaintiff-Appellant,

/s/ David Milton
David Milton, First Circuit No. 125026
**Law Offices of Howard Friedman P.C.**
90 Canal Street, Fifth Floor
Boston, MA 02114-2022
617-742-4100
dmilton@civil-rights-law.com

Dated: February 15, 2018

34

## CERTIFICATE OF SERVICE

I certify that on this day I caused the above document to be served upon

the attorneys of record for Defendants-Appellees via Notice of Docket Activity

generated by the Court's electronic filing system, to Tory A. Weigand, William J.

Flanagan, and Curtis L.S. Carpenter, who all are ECF Filers and will receive service

via their respective email addresses, which are tweigand@morrisonmahoney.com,

jflanagan@morrisonmahoney.com, and ccarpenter@morrisonmahoney.com.

Attorney for Plaintiff-Appellant,

/s/ David Milton
David Milton, First Circuit No. 125026
**Law Offices of Howard Friedman P.C.**
90 Canal Street, Fifth Floor
Boston, MA 02114-2022
617-742-4100
dmilton@civil-rights-law.com

Dated: February 15, 2018

No. 17-2115

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

JENNA ZINGG,
*Plaintiff-Appellant,*

v.

THOMAS GROBLEWSKI and MASSACHUSETTS PARTNERSHIP FOR
CORRECTIONAL HEALTHCARE,
*Defendants-Appellees.*

_____

Appeal from a Final Judgment of the
United States District Court for the District of Massachusetts

_____

**ADDENDUM FOR PLAINTIFF-APPELLANT JENNA ZINGG**

_____

David Milton, 1st Circuit No. 125026
Howard Friedman, 1st Circuit No. 70615
Georgi Vogel Rosen, 1st Circuit No. 1182152
Law Offices of Howard Friedman, P.C.
90 Canal Street, 5th Floor
Boston, MA 02114-2022
(617) 742-4100

Dated: February 15, 2018

# ADDENDUM

## TABLE OF CONTENTS

Judgment ……………………………………….……………...... Add. 1

Memorandum and Order on Defendants' Motion for Partial
Summary Judgment ………………………………….…..… Add. 2-21

Non-Formulary Request for Humira ……………..……….…... Add. 22

AO450 (Rev. 5/85)  Judgement in a Civil Case

# UNITED STATES DISTRICT COURT

DISTRICT OF _____

JENNA ZINGG

V.

THOMAS GROBLEWSKI, ET A L.

## JUDGMENT IN A CIVIL CASE

Case Number:        15-CV-10771-ADB

☐ **Jury Verdict.** This action came before the Court for a trial by jury.  The issued have been tried and the jury has rendered its verdict.

X **Decision by Court.** This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED

   In accordance with the Memorandum and Order entered on 9/29/17, the court allows Defendants' motion for partial summary judgment as to Count I of the amended complaint.

   Count II is dismissed without prejudice to refiling in state court. Full discovery has taken place in federal court and the case is ready to be set for trial.

_____11/7/17_____
Date

Robert M. Farrell
Clerk

(By) Deputy Clerk

Add. 001

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JENNA ZINGG, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 15-cv-10771-ADB |
| THOMAS GROBLEWSKI and | * | |
| MASSACHUSETTS PARTNERSHIP FOR | * | |
| CORRECTIONAL HEALTHCARE, | * | |
| | * | |
| Defendants. | * | |
| | * | |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

This case concerns the medical treatment of Plaintiff Jenna Zingg, who was held pending trial in the Massachusetts Correctional Institute–Framingham ("MCI–Framingham") for approximately six months. She has sued Defendants Thomas Groblewski and the Massachusetts Partnership for Correctional Healthcare ("MPCH") for common law negligence and under 42 U.S.C. § 1983, alleging that they acted with deliberate indifference to her serious medical needs in violation of the Eighth and Fourteenth Amendments by failing to adequately care for her psoriasis and psoriatic arthritis. Defendants now seek partial summary judgment on the § 1983 claim. For the reasons that follow, Defendants' motion is ALLOWED.

## I.    BACKGROUND

Because this is Defendants' motion for summary judgment, the Court must construe the facts in the light most favorable to Plaintiff, drawing all reasonable inferences in her favor. See

1

Feeney v. Corr. Med. Servs., Inc., 464 F.3d 158, 161 (1st Cir. 2006). Accordingly, the factual summary that follows is culled from Plaintiff's statement of facts ("Pl. Facts") [ECF No. 56] and those portions of Plaintiff's response to Defendants' facts ("Pl. Resp.") [ECF No. 55] that indicate the lack of a factual dispute. Additional facts are reserved for later discussion.

### A.    Plaintiff's History with Psoriasis

Plaintiff was a pretrial detainee in MCI–Framingham from March 12, 2013, to September 5, 2013. Pl. Facts ¶ 1. Before entering that facility, she had a long history of severe psoriasis dating back to 2003. Id. ¶ 2. Psoriasis is a chronic inflammatory condition that causes red, scaly plaques to form on the skin. Id. ¶¶ 3–4. These plaques are often itchy and painful. Id. ¶ 4. Plaintiff had suffered from numerous forms of psoriasis that at times covered up to 30 percent of her skin. Id. ¶ 6–7. She also had a history of joint pain and swelling, which was probably a form of psoriatic arthritis. Id. ¶¶ 14–15.

There are at least two types of drugs used to treat psoriasis: topical medications, which are applied to the skin, and "systemic" medications, which are internal and target the immune system. See id. ¶¶ 9, 11. Prior to entering MCI–Framingham, Plaintiff had tried various topical treatments for her condition, including one weaker drug, a vitamin D analog called Dovonex, and one stronger drug, a steroid called clobetasol. Id. ¶ 9. These topical treatments failed to control her psoriasis. Id. ¶ 10. She had also tried a systemic drug called methotrexate, but it caused her severe gastrointestinal side effects. Id. ¶ 11.

Plaintiff responded well, however, to a systemic drug called Humira. Id. ¶ 12, 19. Humira works by suppressing the immune system. Id. ¶ 13. Although this increases a patient's risk of infection, with proper screening and monitoring Humira can be used safely. Id. While on Humira, Plaintiff's psoriasis was well-controlled and her skin was mostly clear of plaques. Id. ¶

12, 19. Plaintiff's joint pain and swelling also subsided when she was on Humira. Id. ¶ 15, 19.

Plaintiff had been taking Humira continuously for approximately 10 months when she entered

MCI–Framingham. Id. ¶ 18.

### B. Relationship Between MPCH, Dr. Groblewski, and Department of Corrections

During Plaintiff's pretrial detention, two different contractors oversaw the medical care

for prisoners housed at Department of Correction ("DOC") facilities, including MCI–

Framingham. See Pl. Resp. ¶¶ 2–5. Prior to July 1, 2013, UMass Correctional Healthcare

("UMass"), which is not a party to this case, was the medical contractor. Id. ¶¶ 2–3. As of July 1,

2013, Defendant MPCH took over those duties, entering into a contract with DOC to provide all

medical and mental health services to those being held in DOC facilities. Id. ¶ 4.

Defendant Groblewski is the statewide medical director for MPCH and has held this

position since July 1, 2013. Id. ¶ 6. Prior to this position, Dr. Groblewski was the statewide

medical director for UMass. Id. Thus, at all times relevant to this case, Dr. Groblewski was the

statewide medical director for the contractor in charge of providing medical services to those

housed in DOC facilities. See id.

### C. Plaintiff's Treatment at MCI–Framingham

Plaintiff's first medical examination at MCI–Framingham occurred about nine days after

she entered the facility, on March 21, 2013. Pl. Facts ¶ 20. During this exam, a nurse practitioner

noted Plaintiff's history of failed psoriasis treatments and that her condition was "well-controlled

on Humira." Id. It was also noted that Plaintiff was due for her next Humira shot on March 26,

2013. Id.

On April 1, 2013, Patricia Casella, a physician's assistant ("PA"), submitted a request to

refer Plaintiff to a rheumatologist at Lemuel Shattuck Hospital for the purpose of developing a

3

plan of care, to include treatment for her psoriasis. Id. ¶ 21. On April 19, 2013, this request was denied, although it is unclear on this record by whom, with the recommendation that Plaintiff continue with on-site medical treatment "using an existing formulary."[1] Id. ¶ 24; ECF No. 46, Ex. 10 at 36.

PA Casella appears to have been Plaintiff's primary point of contact with prison medical services during her period of incarceration. At a visit on April 25, 2013, PA Casella observed small spots of psoriasis on both of Plaintiff's elbows and noted that Plaintiff reported experiencing elbow pain since being off Humira. Pl. Facts ¶ 25. By this time, PA Casella had received Plaintiff's medical records from her regular dermatologist, which documented Plaintiff's history of failed psoriasis treatments and her positive response to Humira. Id. ¶¶ 26, 74–76. PA Casella nonetheless wrote that her plan was to prescribe clobetasol and a prescription shampoo. Id. ¶ 27.

Meanwhile, between April and August 2013, Plaintiff submitted at least 15 "sick call request" forms—or "sick slips"—that described her worsening condition. Id. ¶¶ 22, 23, 30, 31, 32, 46, 48. The first, submitted on April 10, 2013, noted that she was two weeks overdue for her scheduled Humira shot and that her psoriasis had already begun to return. Id. ¶ 22. By early July 2013, she described plaques "all over" her body, covering her arms, armpits, thigs, hands, ears, feet, vaginal area, buttocks, and other areas, such that it hurt to walk or shower. Id. ¶ 31.

---

[1] In this context, "formulary" refers to a list of medications that have been pre-approved to administer to patients. See Formulary, MERRIAM-WEBSTER ONLINE DICTIONARY (medical definition), https://www.merriam-webster.com/dictionary/formulary (last accessed September 21, 2017). See also [ECF No. 44-4] (UMass Correctional Health Plaque Psoriasis Protocol (listing formulary and non-formulary medications)); [ECF No. 44-6] (The Commonwealth of Massachusetts State Office of Pharmacy Services, Correctional Facilities Drug Formulary (2013) (similar)).

PA Casella saw Plaintiff on July 12, 2013, noting the extensive presence of psoriatic plaques and joint pain. Id. ¶¶ 33–34. After this visit, PA Casella prescribed two medications, Humira and Dovonex, neither of which was on the drug formulary used by Defendant MPCH. Id. ¶ 35. In order to obtain approval for each of these drugs, PA Casella was required to—and did—fill out non-formulary request forms. Id. Each form described Plaintiff's history of moderate to severe psoriasis, her lack of success on clobetasol over the prior months, her positive response to Humira before entering MCI–Framingham, and the severity of her then-current condition. Id. ¶ 36–37.

As part of his job, Dr. Groblewski reviewed virtually all non-formulary requests made by MPCH practitioners, including the two just described. Id. ¶ 38–39. On July 15, 2013, he approved the request for Dovonex, but denied the one for Humira. Id. ¶ 41. This was Dr. Groblewski's first contact with Plaintiff's case. At this point, Dr. Groblewski had not examined Plaintiff or reviewed her medical records, and he knew nothing about her other than what PA Casella had included in the non-formulary request forms. Id. ¶¶ 42–43, 69, 73.

Plaintiff's condition continued to worsen. Id. ¶ 45. By late July 2013, Plaintiff's psoriasis had begun to interfere with her daily activities. Id. ¶ 49. She experienced pain when sitting, walking, washing herself, and getting dressed. Id. ¶¶ 49, 50. Plaintiff also began to exhibit changes in behavior and mood. Id. ¶ 51. She became depressed, had trouble sleeping, and generally avoided others. Id. ¶¶ 32, 52, 53, 56. On July 30, 2013, a corrections officer expressed concern to a social worker intern that Plaintiff had become more irritable and stayed in her cell. Id. ¶ 54.

On August 1, 2013, PA Casella submitted a referral request for Plaintiff to see a dermatologist at the outpatient clinic at Lemuel Shattuck Hospital. Id. ¶ 55. MPCH approved the

Add. 006

request on August 6, 2013. Id. Plaintiff was treated at the clinic on August 9, 2013, at which time psoriatic plaques covered 30 percent of Plaintiff's body. Id. ¶ 58–59. She was diagnosed with severe psoriasis and mild psoriatic arthritis, admitted as an inpatient, screened for risk of infection, and given an initial dose of Humira on August 11, 2013. Id. ¶¶ 59–60.

Plaintiff was discharged and returned to MCI–Framingham the next day with a plan to follow up with the rheumatology clinic for further evaluation, which did not occur. Id. ¶ 61–63. She did, however, receive a Humira shot at the prison on August 27, 2013. Id. ¶ 64. By September 3, 2013, Plaintiff had experienced significant improvement in her condition, and, on September 5, 2013, she was released from MCI–Framingham. Id. ¶¶ 63–64.

### D.   Procedural History

Plaintiff commenced this case in March 2015 and filed an Amended Complaint in February 2016, naming as Defendants Dr. Groblewski in his individual capacity and MPCH. [ECF Nos. 1, 22 at 2]. The Amended Complaint includes two counts against both Defendants, with Count One arising under § 1983 and Count Two sounding in common law negligence. [ECF No. 22 at 9–10]. The Amended Complaint seeks compensatory and punitive damages, as well as costs and attorney's fees. Id. at 10–11.

In February 2016, the case was referred to a medical malpractice tribunal. [ECF No. 26]. Defendants represent that the case passed the tribunal as to both Defendants on September 28, 2016. [ECF No. 42 at 2]. Meanwhile, fact discovery was completed in August 2016, and expert discovery was completed in November 2016. [ECF Nos. 35–38, 42 at 2].

Defendants then moved for partial summary judgment on Count One. [ECF No. 41]. Plaintiff opposed the motion in January 2017 [ECF No. 57], and Defendants filed a reply brief [ECF No. 62]. The motion is now ripe for adjudication.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

At summary judgment, the Court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Feeney, 464 F.3d at 161. Summary judgment is appropriate if the record shows there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Id. (citing Fed. R. Civ. P. 56(c)). A dispute is considered genuine if a reasonable jury, drawing favorable inferences, could resolve it in favor of the non-moving party. Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015). A party succeeds in showing the lack of a genuine dispute of material fact when she affirmatively produces evidence that negates an essential element of the non-moving party's claim, or, using evidentiary materials in the record, demonstrates that the non-moving party will be unable to carry her burden of persuasion at trial. Id. at 4–5.

### B.    Constitutionally Inadequate Care

Count One, Plaintiff's § 1983 claim, alleges a violation of the Eighth Amendment, which applies to the states through the Fourteenth Amendment, see Torraco v. Maloney, 923 F.2d 231, 233 n.3 (1991). In this context, the Eighth Amendment protects prisoners from "deliberate indifference to serious medical needs," Feeney, 464 F.3d at 161–62 (quoting Estelle v. Gamble, 429 U.S. 97, 105–06 (1976)), meaning a violation arises when medical care is "so inadequate as to shock the conscience," id. at 162 (quoting Torraco, 923 F.2d at 235).

To succeed on such a claim, a plaintiff must satisfy both an objective and subjective inquiry.[2] Perry v. Roy, 782 F.3d 73, 78 (1st Cir. 2015) (quoting Leavitt v. Corr. Med. Servs., 645

---

[2] Although described in two prongs, the First Circuit has recognized that there is often analytical and evidentiary overlap between the prongs. See Kosilek v. Spencer, 774 F.3d 63, 83 n.7 (1st

Add. 008

F.3d 484, 497 (1st Cir. 2011)). The objective prong requires proof of a sufficiently serious medical need. See id. The need must be "one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir. 2014) (en banc), cert. denied, 135 S. Ct. 2059 (2015) (quoting Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir.1990)).

The subjective prong requires the plaintiff to show that prison officials possessed a sufficiently culpable state of mind—namely, deliberate indifference to the claimant's health or safety. Perry, 782 F.3d at 78. "For purposes of this subjective prong, deliberate indifference 'defines a narrow band of conduct' and requires evidence that the failure in treatment was purposeful." Kosilek, 774 F.3d at 83 (citation omitted). "The obvious case would be a denial of needed medical treatment in order to punish the inmate." Feeney, 464 F.3d at 162 (quoting Watson v. Caton, 984 F.2d 537, 540 (1st Cir.1993)). Yet deliberate indifference may also reside in "wanton" or "reckless" actions, although recklessness is to be understood "not in the tort law sense but in the appreciably stricter criminal-law sense, requiring actual knowledge of impending harm, easily preventable." Id.

Under this formulation, an "inadvertent failure to provide adequate medical care" does not give rise to a constitutional violation because it "cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" Estelle, 429 U.S. at 105–06. Similarly, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under [Supreme Court case law]

_____

Cir. 2014) (en banc), cert. denied 135 S. Ct. 2059 (2015) (describing how adequacy of care is germane both to objective need for surgery and to alleged deliberate indifference to that need).

be condemned as the infliction of punishment." <u>Farmer v. Brennan</u>, 511 U.S. 825, 838 (1994).

Thus, substandard treatment, "even to the point of malpractice," is not enough to show an Eighth

Amendment violation. <u>Feeney</u>, 464 F.3d at 162 (quoting <u>Layne v. Vinzant</u>, 657 F.2d 468, 474

(1st Cir. 1981)). This is because the Constitution "does not impose upon prison administrators a

duty to provide care that is ideal, or of the prisoner's choosing." <u>Kosilek</u>, 774 F.3d at 82.

Accordingly, when the treatment simply reflects a disagreement on the appropriate course of

treatment, such a dispute may present a colorable claim of negligence, but will fall short of

alleging a constitutional violation. <u>Id.</u> <u>See also</u> <u>Sires v. Berman</u>, 834 F.2d 9, 13 (1st Cir. 1987)

("Where the dispute concerns not the absence of help, but the choice of a certain course of

treatment, or evidences mere disagreement with considered medical judgment, [the Court] will

not second guess the doctors.").

## III.   ANALYSIS

Defendants do not dispute that Plaintiff, at all times relevant to this case, had a serious

medical condition that satisfies the objective prong of the inquiry. [ECF No. 42 at 14]. Instead,

they argue that the undisputed facts show their actions in treating Plaintiff do not rise to the level

of deliberate indifference, under the subjective prong, as required to make out a constitutional

claim. <u>Id.</u> They also argue that Dr. Groblewski is entitled to qualified immunity. <u>Id.</u> at 18.

Because the Court agrees with Defendants' first argument, it does not reach the second.

### A.   Constitutionally Inadequate Care—Dr. Groblewski

As discussed, Dr. Groblewski denied the request for Humira and treated Plaintiff instead

with a different non-formulary medication until her inpatient admission on August 9, 2013,

which resulted in Humira being restarted on August 11, 2013. The issue is thus whether Dr.

Groblewski acted with deliberate indifference when he decided to initially try a second topical drug that Plaintiff's medical records showed had previously been ineffective.

Dr. Groblewski argues that he provided Plaintiff with adequate medical care such that she cannot satisfy the subjective prong of the test. Id. at 14. Plaintiff's arguments in response fall into essentially three categories: (1) because it was obvious that the continued use of topical medications would be ineffective in treating Plaintiff's condition, Dr. Groblewski's decision to prescribe Dovonex amounted to providing "no treatment at all" [ECF No. 57 at 4–5]; (2) Dr. Groblewski showed deliberate indifference by failing to obtain more information about Plaintiff before denying Humira, id. at 5–8; and (3) Dr. Groblewski's proffered reasons for denying Humira are not credible, and a reasonable fact-finder could infer that he made this decision for financial reasons, id. at 8–14.

"A state-of-mind issue such as the existence of deliberate indifference usually presents a jury question." Torraco, 923 F.2d at 234. "However, where there is no evidence of treatment so inadequate as to shock the conscience, let alone that any deficiency was intentional, or evidence of acts or omissions so dangerous (in respect to health or safety) that a defendant's knowledge of a large risk can be inferred, summary judgment is appropriate." Id. (citations and internal quotation marks omitted).

In this case, even construing the facts in the light most favorable to Plaintiff and making all reasonable inferences in her favor, the record would not permit a reasonable fact-finder to conclude that Dr. Groblewski's treatment of Plaintiff was so inadequate as to "shock the conscience," id., or that he "[knew] of and disregard[ed] an excessive risk to inmate health or safety," Farmer, 511 U.S. at 837. Dr. Groblewski did provide treatment by prescribing Dovonex. Thus, although he did not initially approve Humira, he did prescribe a course of treatment that

10

was consistent with a recommendation by PA Casella and with prison protocol. See Pl. Resp. at 4–5 (undisputed that treatment protocol "has two steps for topical treatments before the two steps for systemic medications"). "The courts have consistently refused to create constitutional claims out of disagreements between prisoners and doctors about the proper course of a prisoner's medical treatment." Watson, 984 F.2d at 540. Further, the record is devoid of evidence that Dr. Groblewski chose this course of treatment knowing of, or consciously disregarding, an excessive risk to Plaintiff's health. While there was a risk that the treatment would not work, Dr. Groblewski's decision to try a different treatment first (even one that, unbeknownst to him, had failed to alleviate Plaintiff's symptoms in the past) does not rise to the level of a constitutional violation, particularly when Plaintiff was treated with Humira once it became evident that the Dovonex was not working. Without some indication that Dr. Groblewski actually knew the Dovonex treatment would fail or subjectively believed it was very likely to fail, Plaintiff cannot succeed in showing that he acted with deliberate indifference. See Farmer, 511 U.S. at 837, 839.

Plaintiff claims "it was obvious" that clobetasol was a more potent topical medication than Dovonex, and therefore Dr. Groblewski's choice to treat Plaintiff with a lower-potency medication after a higher-potency one had proven unsuccessful was, in the words of Plaintiff's expert, akin to "shooting a pistol at an armored car after a missile had failed." [ECF No. 57 at 5]; Pl. Facts ¶¶ 43, 77. Even assuming this to be true, however, the record still fails to demonstrate deliberate indifference for two related reasons.

First, with regard to Dr. Groblewski's subjective state of mind, there is nothing in the record to support an inference that the decision to try Dovonex was intended to harm Plaintiff, or that he wantonly or recklessly ignored a known risk of Plaintiff's health—particularly when this course of treatment was both recommended by PA Casella and consistent with the prison

11

protocol requiring a patient to try and fail two topical treatments before systemic drugs are considered. See Pl. Resp. at 4–5. Also, it is undisputed that Humira suppresses a patient's immune system, thereby making the patient more susceptible to infections. Pl. Facts ¶ 13; Pl. Resp. at 7–8. Plaintiff acknowledges that Humira is "not prescribed lightly." [ECF No. 57 at 6]. In a public prison setting, Dr. Groblewski's decision to delay prescribing a drug with an increased risk of infection for a short period of time (less than a month) to determine whether a less-drastic remedy would suffice cannot reasonably be interpreted as evincing a "deliberate intent to harm" or "wanton disregard" for a prisoner's health, see Battista v. Clarke, 645 F.3d 449, 453 (1st Cir. 2011)—at least not without additional facts to support such a conclusion.

Second, even assuming, as Plaintiff urges, that Dovonex was unlikely to relieve Plaintiff's symptoms, Plaintiff has not produced any evidence that Dr. Groblewski intended for Dovonex to supplant, rather than supplement, Plaintiff's clobetasol treatment. In fact, the record supports the opposite conclusion—that the two drugs were intended to be used together. See Pl. Resp. at 46–50. Plaintiff does not contend, nor is there evidence to show, that Dr. Groblewski's chosen treatment, a combination of Dovonex and clobetasol, would be weaker or less effective than a straight clobetasol treatment. Accordingly, the "impending harm," Watson, 984 F.2d at 540, facing Plaintiff in the wake of Dr. Groblewski's treatment decision was far from the foregone conclusion that Plaintiff makes it out to be.

Once it became evident, after approximately three weeks, that the combination of clobetasol and Dovonex was not working, Plaintiff was treated at the Lemuel Shattuck Hospital clinic where, on August 11, 2013, she received a dose of Humira. Pl. Facts ¶¶ 58, 60. She later received a second Humira shot at the prison on August 27, 2013, shortly prior to her release. Id. ¶ 64. Again, these undisputed events, following in sequence from Dr. Groblewski's initial decision

12

to prescribe Dovonex rather than Humira, demonstrate "not the absence of help, but the choice of a certain course of treatment." Sires, 834 F.2d at 13. Although a reasonable fact-finder could fault Dr. Groblewski for the delay in getting Plaintiff treated with Humira, the delay under the circumstances of this case does not rise to the level of a constitutional violation. See Estelle, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); DesRosiers v. Moran, 949 F.2d 15, 20 (1st Cir. 1991) ("[A] claim of inadequate medical treatment which reflects no more than a disagreement with prison officials about what constitutes appropriate medical care does not state a cognizable claim under the Eighth Amendment."); Miranda v. Munoz, 770 F.2d 255, 259 (1st Cir. 1985) ("[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law[.]" (citations and internal quotation marks omitted)).

This reluctance to find a constitutional violation where a prisoner has received adequate, although arguably not ideal, medical treatment finds ample support in the case law of this circuit. For instance, in Ruiz-Rosa v. Rullan, 485 F.3d 150, 151, 156 (1st Cir. 2007), after a prisoner died of septicemia while in custody, the plaintiff presented an expert who opined that the prisoner "was given ineffective antibiotics, that doses of the antibiotics which were prescribed were missed, that the staff failed to keep adequate medical records, and that the staff failed to respond when [the prisoner's] condition worsened." Yet, the First Circuit found that record insufficient to survive summary judgment on the issue of deliberate indifference because there was no evidence that the treating doctor "was aware that the antibiotic he prescribed was ineffective and would pose a substantial risk of harm to [the prisoner]." Id. at 156.

Similarly, in Feeney, 464 F.3d at 162, the First Circuit affirmed a grant of summary judgment for defendants when prison medical officials delayed, for about 22 months, providing the plaintiff with orthopedic footwear that had previously been prescribed to him. The plaintiff's claim fell short of an Eighth Amendment violation in part because, during that 22-month span, he was examined by several medical professionals and received other treatments for his symptoms. Id. While the record may have "reflected poor judgment on the part of some defendants," it did not rise to the level of deliberate indifference in the constitutional sense. Id. at 163. Additionally, in Torraco, 923 F.2d at 233–34, a deliberate indifference claim failed where the plaintiff's son committed suicide in prison after prison officials neglected to provide the son with psychiatric care or take precautionary measures such as placing him in a "suicide cell." The case did not survive summary judgment on the § 1983 claim (although it "very well" may have presented a claim of negligence) because prison officials provided individual counseling to the inmate and were responsive when he expressed a need for mental health attention. Id. at 235–36.

This case resembles Ruiz-Rosa, Feeney, and Torraco in the sense that Plaintiff was not denied treatment outright, but rather was provided one course of treatment over her preferred course of treatment—and even then, only for less than a month, after which time her medication was changed and her condition quickly improved. Those facts are insufficient to prove an Eighth Amendment violation because prison administrators are under no "duty to provide care that is ideal, or of the prisoner's choosing." Kosilek, 774 F.3d at 82. The undisputed facts show a conservative, but ultimately successful, course of treatment. At bottom, Dr. Groblewski did not make a "'wanton' decision[] to deny or delay care" or act with "actual knowledge of impending harm, easily preventable." Watson, 984 F.2d at 540.

14

Because Dr. Groblewski did not refuse to treat Plaintiff outright and because Plaintiff received follow-up treatment once it became clear that clobetasol and Dovonex together were not working, this case is readily distinguishable from those cases in which the First Circuit has found a colorable claim of deliberate indifference. For example, in Perry, 782 F.3d at 80, summary judgment was inappropriate because a fact-finder could have determined that although the inmate alerted officials to his broken jaw, they conducted only cursory examinations of him and withheld treatment, telling him to "sleep it off." Similarly, in Leavitt, 645 F.3d at 499, the record would have permitted a fact-finder to conclude that a physician's assistant acted with deliberate indifference when he failed to examine the viral load report of an HIV-positive inmate. In contrast, here it is undisputed that Dr. Groblewski did not became aware of Plaintiff's condition until July 15, 2013, at which point he prescribed an additional medication, Dovonex. Her condition then was monitored, up to and including her admission to the clinic on August 11, 2013, at which point she received a Humira shot, followed by the administration of a second Humira shot at MCI–Framingham on August 27, 2013. These undisputed facts surrounding Dr. Groblewski's chosen course of treatment foreclose a finding of the type of "callous disregard in the face of a pressing medical emergency" or "treatment so inadequate as to shock the conscience" or "deficiency [in treatment that] was intentional" that is required to support a finding of deliberate indifference. Sires, 834 F.2d at 13.

Even so, Plaintiff asserts that Dr. Groblewski's decision to deny Humira amounted to making no decision at all in that it was based on rote adherence to the MPCH formulary without any examination of Plaintiff or her medical records, and that this is enough to establish deliberate indifference. [ECF No. 57 at 5, 10]. For support, she primarily relies on Johnson v. Wright, 412 F.3d 398, 406 (2d Cir. 2005), where the court noted that "a jury could find that the defendants

acted with deliberate indifference by reflexively relying on the medical soundness" of treatment guidelines "when they had been put on notice that the medically appropriate decision could be, instead, to depart" from said guidelines. Two important factors distinguish this case from Johnson and cases like it: the time line and the nature of the recommendation that Plaintiff receive a particular course of treatment. In Johnson, the prisoner was denied a specific Hepatitis C treatment for about 18 months "in the face of the unanimous, express, and repeated recommendations of plaintiff's treating physicians" that he receive the withheld treatment. Id. at 400–02, 406. Here, less than a month elapsed between Dr. Groblewski's initial decision to deny Humira in favor of a second topical medication and Plaintiff's first dose of Humira while in custody. See Pl. Facts ¶¶ 41, 60. Further, there is no evidence of "unanimous" or "repeated" recommendations that Plaintiff receive Humira—only the one recommendation, by PA Casella, which was submitted at the same time as her recommendation that Plaintiff receive Dovonex. See id. ¶¶ 35–37. Nor is there any evidence that any other physician told Dr. Groblewski that they disagreed with his decision. Thus, the MPCH professional who had the most information about Plaintiff's condition recommended two types of treatment. Dr. Groblewski, rather than approving both, chose the one that was less drastic and fit into the MPCH treatment protocol for Plaintiff's particular disease, and he avoided giving a drug in a prison setting that indisputably would have put Plaintiff at a higher risk of infection. See Pl. Facts ¶¶ 85; Pl. Resp. at 4–5, 7–8. And again, although the Humira recommendation was initially rejected, it was, after less than a month on Dovonex, ultimately followed. Pl. Facts ¶ 60. See also Pl. Resp. at 74–75 (acknowledging that Dovonex was prescribed "pending Humira approval").

Finally, Plaintiff argues that Dr. Groblewski's stated reasons for denying Humira are not credible, and instead the evidence supports the inference that he denied Humira for financial

16

reasons. [ECF No. 57 at 8, 11–13]. The suggestion that Dr. Groblewski denied Humira for financial reasons is not reasonably inferable from the evidence in the record. Although a reasonable fact-finder could accept the basic proposition that Humira is more expensive than either clobetasol or Dovonex, see Pl. Facts ¶ 17, there is no evidence that this cost differential had any bearing on Dr. Groblewski's decision regarding how to treat Plaintiff. Further, it is undisputed that Plaintiff received two doses of Humira while in DOC custody, including one shortly before she left DOC custody, Pl. Facts ¶¶ 60, 64, and that MPCH and UMass approved more than 70 new prescriptions for Humira or similar medications for persons in DOC custody in 2013 alone, Pl. Resp. at 7–8, 64. These facts belie the assertion that Humira was systemically denied to save money.

Even if a rational fact-finder could conclude that the cost differential was a factor in Dr. Groblewski's decision to delay the Humira treatment until the combination of Dovonex and clobetasol proved unsuccessful, that alone would not necessarily give rise to a claim of deliberate indifference. See, e.g., Morris v. Livingston, 739 F.3d 740, 748 (5th Cir. 2014), cert. denied, 134 S. Ct. 2734 (2014) (noting that deliberate indifference standard "does not guarantee prisoners the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most non-prisoners in our society"); Winslow v. Prison Health Servs., 406 F. App'x 671, 674 (3d Cir. 2011) (consideration of cost alone does not state a claim for deliberate indifference because "prisoners do not have a constitutional right to limitless medical care, free of the cost constraints under which law-abiding citizens receive treatment"); Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir. 2006) ("The cost of treatment alternatives is a factor in determining what constitutes adequate, minimum-level medical care[.]"). This is particularly true where nothing in the record permits an inference that cost considerations overrode Dr.

Groblewski's professional medical judgment. See Battista, 645 F.3d at 453 (noting that Supreme Court's Eighth Amendment jurisprudence "leave[s] ample room for professional judgment, constraints presented by the institutional setting, and the need to give latitude to administrators who have to make difficult trade-offs as to risks and resources"); DesRosiers, 949 F.2d at 19 ("In evaluating the quality of medical care in an institutional setting, courts must fairly weigh the practical constraints facing prison officials."). Nor would the fact that Dr. Groblewski considered cost when choosing Plaintiff's treatment regimen, on its own, solve the defect identified above— that the record is devoid of evidence to support an inference that Dr. Groblewski knew of or ignored an obvious risk to Plaintiff's health in choosing the course of treatment.[3] See, e.g., Brady v. Aldridge, 493 F. App'x 790, 791 (7th Cir. 2012) (rejecting deliberate indifference claim based on allegation that prison dentist's choice of treatment was motivated by cost-savings rather than professional judgment because plaintiff failed to plausibly allege that dentist recklessly or intentionally harmed him).

For these reasons, summary judgment is appropriate in Defendants' favor with respect to the § 1983 claim against Dr. Groblewski.

## B.    Constitutionally Inadequate Care—MPCH

Given the above discussion of Dr. Groblewski's conduct, this record cannot support the imposition of § 1983 liability against MPCH. The Court will assume for purposes of argument that MPCH, a private contractor, could be held liable under § 1983 on a theory resembling municipal liability—a question not expressly resolved in the First Circuit, see Leavitt, 645 F.3d at 504 n.30. Even so, "[w]here, as here, there is no constitutional violation by the employees of

---

[3] With respect to Dr. Groblewski's other potential motivations, Plaintiff's argument asks the Court to make credibility determinations, which is not permitted at summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

the municipality, there can be no liability predicated on municipal policy or custom." Id. at 504. For the reasons already discussed, Dr. Groblewski did not violate Plaintiff's constitutional rights, and Plaintiff does not attempt to show a constitutional violation by any other employee of MPCH. Plaintiff offers no argument for imposing liability on MPCH absent a finding of wrongdoing by Dr. Groblewski. [See ECF No. 57 at 18–19]. Accordingly, Plaintiff's § 1983 claim against MPCH cannot survive Defendants' motion for summary judgment.

### C.    Remaining negligence claim

Having granted summary judgment in Defendants' favor with respect to the § 1983 claim, only Plaintiff's common law negligence claim remains. The parties have not yet expressed a position as to whether the Court should exercise supplemental jurisdiction over this claim pursuant to 28 U.S.C. § 1367.

A district court "may decline to exercise supplemental jurisdiction" once it "has dismissed all claims over which it has original jurisdiction." Eves v. LePage, 842 F.3d 133, 146 (1st Cir. 2016) (quoting 28 U.S.C. § 1367(c)(3)). Among the factors relevant to this decision are (1) whether assuming jurisdiction might promote "judicial economy" and "convenience," and (2) whether declining jurisdiction might promote "comity" or afford the parties a "surer-footed reading of applicable law" from state courts. Id. (quoting United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966)). The First Circuit has stated "that in the usual case in which all federal-law claims are eliminated before trial, the balance of factors [from Gibbs] will point toward declining to exercise jurisdiction over the remaining state-law claims." Id. (quoting Rivera–Díaz v. Humana Ins. of P.R., Inc., 748 F.3d 387, 392 (1st Cir. 2014) (alteration in original)).

Add. 020

Here, unlike in "the usual case," the balance of <u>Gibbs</u> factors tips in favor of the Court exercising supplemental jurisdiction over Plaintiff's remaining negligence claim. There can be little doubt that this state law claim qualifies for supplemental jurisdiction under § 1367(a), as it derives from the same "common nucleus of operative fact," <u>Gibbs</u>, 383 U.S. at 725, as the § 1983 claim. Further, since this case originated in March 2015, the parties have completed fact and expert discovery to develop a robust factual record in this Court. Finally, the remaining negligence claim, based on the briefing so far, does not appear to present a novel or complex issue of law that would favor resolution by a state court. See <u>Cavallaro v. UMass Memorial Healthcare, Inc.</u>, 678 F.3d 1, 9 (1st Cir. 2012) (approving of district court exercising supplemental jurisdiction when "[t]he claim arises from the same nucleus of facts as the rest of plaintiffs' claims, the question is purely legal and, although perhaps novel, it is by no means complex"). Accordingly, the aims of judicial economy and convenience to the parties are furthered, and comity is not disserved, by the Court retaining jurisdiction over the negligence claim.

## IV.    CONCLUSION

Although the treatment given to Plaintiff may not have been optimal, the record before the Court would not permit a rational fact-finder to determine that Defendants provided Plaintiff with constitutionally inadequate care. Therefore, the Court must <u>ALLOW</u> Defendants' motion for partial summary judgment [ECF No. 41]. The Court will exercise supplemental jurisdiction over the remaining negligence count of the Amended Complaint.

SO ORDERED.

Dated: September 29, 2017

/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE

Add. 021

☐ Psychiatric Medication
Fax to PDC (Pharmacy Distribution Center) at the same time the order is entered into WebRx
☐ Medical Medication

## NONFORMULARY MEDICATION ORDER- MASSACHUSETTS DEPARTMENT OF CORRECTION

NAME: Zingg Jenna

ID NUMBER: A123203    D.O.B ████/85

INSTITUTION: F

ALLERGIES:

DATE: 7/12/2013    TIME: 10

This request is: ☐ URGENT (within 48 hours)
☒ ROUTINE (within 3 days)

**Medication:**

| Medication/Diagnosis | Medical Order must include: Medication name, dose, route, duration and frequency.<br>Humira 40mg IM every 2 weeks for 180 days | Duration | New Medication |
|---|---|---|---|
| Plaque psoriasis | | | |
| | Start date of order will be date of non-formulary approval. | | |

**Target Symptoms for This Medication:**

| Monitoring Parameters | Desired Outcome |
|---|---|
| Pt is followed in cc | |

☐ **New Non-Formulary Medication Request** (new to inmate or new inmate to facility)

☐ Inmate was prescribed this medication prior to entering facility (indicate duration of treatment):
Previous medication trials (document dose, duration, and reason for discontinuing)

Clobetasol .05% cream ✳

Describe why non-formulary medication is desired:
Pt with a history of moderate to severe psoriasis on Humira in community. Outside records obtained & confirms this history. Pt was started on Clobetasol .05% cream here several months back. Pt seen today for increasing psoriasis & joint pain. On examination but has moderate plaque lesion on elbows. Proximal inner thighs & vulva & periectal area with severe psoriasis noted. covering 90% of t his area. Pt needs to resume her humira 40mg every other week as in community.

☐ **Renewal Non-Formulary Medication Request** (Previously Approved)
Document response to medication

SIGNATURE: _____

PRINT NAME: Patricia Casella PAC    PAGER #: _____

Recommendation: ☐ Approval;  Duration of Approval: _____ Dose Range: _____
☐ Denial

Medical Director's Signature: _____    Date: _____
Comments: _____

Pharmacist's Signature: _____    Date: 7/15/13
Comments: Denied per Dr G.

7.15  D, G

Emailed

Expiration Date: _____

050

Add. 022